UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

PROGRESSIVE DISTRIBUTION
SERVICES, INC.,

      Plaintiff,

v.                                                                                          Case No. 1:14-CV-430

UNITED PARCEL SERVICE, INC.,                                          HON. GORDON J. QUIST
a Delaware corporation, UNITED
PARCEL SERVICE, INC., an Ohio
corporation, UNITED PARCEL SERVICE
OF AMERICA, INC., a Delaware
corporation, and UNITED PARCEL
SERVICE MARKET DRIVER, a Georgia
corporation,

      Defendants.
_____/

## **OPINION**

      Plaintiff, Progressive Distribution Services, Inc. (Progressive), has sued several Defendants in the United Parcel Services family of companies (collectively referred to herein as UPS) alleging that UPS is liable for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and the common law.  Progressive also alleges that UPS violated the Michigan Consumer Protection Act (MCPA), M.C.L.A. § 445.901 *et seq.*.  All of Progressive's claims arise out of UPS's use of Progressive's federally-registered trademark ORDERLINK as part of the name UPS OrderLink.

      UPS has moved for summary judgment, arguing that Progressive's trademark and unfair competition claims fail because, as a matter of law, Progressive cannot establish a likelihood of confusion.  Alternatively, UPS argues that it is entitled to summary judgment on Progressive's

damage claim for corrective advertising and other elements, as well as Progressive's claim for a reasonable royalty. Finally, UPS argues that Progressive's MCPA claim fails because UPS's shipping application was not offered for personal, family, or household purposes.

As explained more fully below, the Court concludes that UPS is entitled to summary judgment on the trademark and unfair competition claims because application of the pertinent factors in *Frisch's Restaurant, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642 (6th Cir. 1982), in light of the record evidence, shows that there is no likelihood of confusion as a matter of law. Accordingly, the Court need not reach UPS's damages arguments relating to those claims. Finally, the Court concludes that Progressive fails to establish a claim under the MCPA.

## I. BACKGROUND

Progressive is engaged in the business of providing, among other things, outsourced, fully-integrated order fulfillment infrastructure and services under various trademarks, including ORDERLINK. (ECF No. 118 at PageID.3208.) Progressive describes OrderLink as an "innovative e-commerce service that allows an organization to quickly participate in the many benefits of direct channel web commerce without the expense, risk, or delay of in-house development." (ECF No. 97-3 at PageID.1799.) Order fulfillment begins upon placement of an order, and includes payment processing, inventory availability and coordination, assistance with alternative products, packaging, labeling, and shipping. (ECF No. 118 at PageID.3209-10.) OrderLink platform features include web commerce features, such as customer product reviews, promotion services, media buy administration, marketing support, affiliate site interfacing, site management tools, supply integration, and payment processing. (ECF No. 97-12.) The OrderLink service typically requires a four-to-six week set up period, and customers must commit to a two-year contract with a set-up fee ranging from a few thousand dollars to $25,000. (ECF No. 99-3 at PageID.50; ECF No. 99-5; ECF No. 99-6.)

John McGovern, Progressive's founder and president, adopted the ORDERLINK mark in approximately 1996 because it reflected Progressive's business of "process[ing] of orders and movement of orders to the final fulfillment." (ECF No. 118 at PageID.3212.) The ORDERLINK mark was registered on the Principal Register of the United States Patent and Trademark Office (PTO) on September 21, 2004. (ECF No. 33-2.)

UPS is the world's largest package shipping company and its trademarks, with their well-known brown and gold color scheme, make UPS one of the world's most famous brands. (ECF No. 97-43.) UPS's customers include, in addition to large volume shippers, small volume shippers who operate businesses on Amazon and eBay marketplaces. (ECF No. 97-23 at PageID.1901.) In 2012, UPS's Customer Technology Marketing (CTM) team proposed an initiative directed to such customers. The project included creation of an internet-based application to enable online marketplace sellers to manage orders and process shipments by linking their orders to UPS's shipping application. (ECF No. 119 at PageID.3226.) UPS intended this service to compete with similar services offered by competitors FedEx and the U.S. Post Office. (ECF No. 97-23 at PageID.1938.)

UPS's CTM team and Christine Allen, UPS's Brand Manager, developed a list of potential names, including OrderLink, for the new service that were descriptive and easy for its customers to understand. (ECF No. 97-16 at PageID.1858, 1860.) Allen searched the proposed names on the internet and at the PTO to determine whether other parties were using them. Allen initially determined that OrderLink was not available because it was registered to Progressive for order fulfillment services. She also found shopping cart software called "Order-Link" by Ashop Software. (ECF No. 97-26 at PageID.1988.) Further investigation revealed at least two additional uses of the words "order" and "link" together: OrderWebLink for computer programs for automating

3

cataloging, sales quotes, and sales ordering by Lantek, Inc., and "Conestoga OrderLink" for software allowing for customized quotes and order management for Conestoga customers (a cabinet manufacturer). (ECF No. 97-25 at PageID.1976.) Ultimately, the CTM team settled on the name UPS OrderLink because the UPS house mark leveraged the UPS brand and OrderLink described the application's function. (ECF No. 97-21 at PageID.1886; ECF No. 97-25 at PageID.1981.) UPS submitted an application to the PTO to register "UPS OrderLink" as a mark. However, on November 25, 2013, the PTO rejected the application based on a likelihood of confusion with Progressive's mark. (ECF No. 136-1 at PageID.3377.)

UPS launched the UPS OrderLink shipping application on December 28, 2013, as a free "secured web-based shipping solution at ups.com that enables eBay and Amazon sellers to import their orders from these marketplaces to the shipping solution and process for shipping." (ECF No. 97-29 at PageID.2003.) UPS promoted UPS OrderLink on its website at www.ups.com, through its online version of UPS's *Compass* magazine on a UPS microsite, and to existing UPS customers through direct sales calls. (ECF No. 97-30; ECF No. 97-56 at PageID.2241–42.) In addition, links to UPS Orderlink were placed on Amazon and eBay pages devoted to shipping solutions. (ECF No. 97-30 at PageID.2036.)

On February 17, 2014, Progressive's counsel sent UPS a cease and desist letter demanding that UPS immediately cease using the UPS OrderLink name. In response, UPS approached Progressive about entering into a coexistence agreement. (ECF No. 97-18 at PageID.1869–70.) While waiting to hear back from Progressive, UPS began to explore replacing UPS OrderLink with "Ship Marketplace Orders." After Progressive filed its complaint in the instant case on April 17, 2014, UPS continued with its name-change plan and adopted the name "UPS Marketplace Shipping." (ECF No. 97-16 at PageID.1862.) The transition from UPS OrderLink to UPS Marketplace Shipping was substantially completed by August 15, 2014.

4

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. DISCUSSION

### A.   Trademark Infringement and Unfair Competition Claims

The key inquiry in resolving claims under the Lanham Act for both trademark infringement and unfair competition is whether there is a likelihood of confusion. *Georgia-Pacific Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1100 (6th Cir. 2012). "The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). In this case, Progressive alleges infringement under a theory of reverse confusion of sponsorship. As the Sixth Circuit has explained, such theory posits that rather than seeking to capitalize on the senior user's goodwill in the trademark:

> the junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the

5

> junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987). Regardless of the theory of confusion, the focus remains on likelihood of consumer confusion.[1] *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012).

In assessing the likelihood of confusion, the Sixth Circuit has identified eight factors that may inform the analysis:

   (1) the strength of the mark;
   (2) the relatedness of the goods or services;
   (3) the similarity of the marks;
   (4) evidence of actual confusion;
   (5) the marketing channels used;
   (6) the likely degree of purchaser care;
   (7) the defendant's intent in selecting the mark;
   (8) the likelihood of expansion of the product lines.

*See Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1984). These factors are "simply a guide to help determine whether confusion is likely." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). A court must apply these factors as they pertain to the peculiar circumstances of the case at hand, but in any event must attempt "a thorough and analytical treatment." *Id.* "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.*

Whether a likelihood of confusion exists is a mixed question of fact and law. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 279. "Summary judgment is as appropriate in a trademark

---

[1] Because the likelihood of confusion test applies as well to trademark infringement and unfair competition claims under Michigan common law, *see Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 354 (6th Cir. 2006), the Court conducts a single analysis for Progressive's Lanham Act and common law trademark infringement and unfair competition claims.

infringement case as in any other case and should be granted or denied on the same principles." *WSM, Inc. v. Tenn. Sales Co.*, 709 F.2d 1084, 1086 (6th Cir. 1983). The Sixth Circuit has observed that a plaintiff seeking to avoid summary judgment in a Lanham Act case "must establish that genuine factual disputes exist concerning those factors that are material to whether confusion is likely in the marketplace as a result of the alleged infringement." *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 622–23 (6th Cir. 1996).

Before examining the pertinent *Frisch's* factors, the Court addresses Progressive's implicit suggestion that the Court should follow, or assign substantial weight to, the PTO examiner's likelihood of confusion analysis in rejecting UPS's registration of UPS OrderLink. Progressive cites no law for this proposition, although some courts, in particular, the Second Circuit and district courts within that circuit, have said that a refusal to register a trademark "is entitled to great weight." *Syntex Labs., Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 569 (2d Cir. 1971). On the other hand, the Third and Ninth Circuits have concluded that a PTO examiner's determination that marks are likely to cause confusion need not be given any weight by a district court. In *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794 (9th Cir. 1970), the Ninth Circuit stated that a determination by a PTO examiner is entitled to little weight if the examiner did not review all of the evidence. The court explained:

> Any such determination made by the Patent Office under the circumstances just noted must be regarded as inconclusive since made at its lowest administrative level . . . . The determination by the Patent Office is rendered less persuasive still by the fact that the Patent Office did not have before it the great mass of evidence which the parties have since presented to both the District Court and this court in support of their claims.

*Id.* at 802 (internal citation omitted). In *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d Cir. 2000), the Third Circuit followed the Ninth Circuit's reasoning in *Carter-Wallace*, noting that "although an initial PTO determination by an examining attorney may be considered, it

7

need not be given weight when the PTO attorney did not review all the evidence available to the District Court." *Id.* at 221. The court further stated that because the determination was made at a low level, it was due no deference. *Id.*; *see also Altairia Corp. v. Woodbolt Distrib., LLC*, No. A-14-CA-471-SS, 2014 WL 3121899, at *2 (W.D. Tex. July 7, 2014) ("A denial by the USPTO of a trademark application on confusion grounds is not equal to a finding of likelihood of confusion in this Court."); *Vining Indus., Inc. v. M.B. Walton, Inc.*, No. C-3-96-314, 1997 WL 1764765, at *4 (S.D. Ohio Mar. 29, 1997) ("[N]owhere has Congress indicated that a decision *not* to register a trademark is entitled to any evidentiary weight."). In addition, the Sixth Circuit has indicated that a district court need not defer to a PTO determination when there is no indication that the examining attorney considered all relevant evidence. *See Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 934 (6th Cir. 1999), *rev'd on other grounds*, 532 U.S. 23, 121 S. Ct. 1255 (2001). Because the USPTO's rejection of UPS's mark was a low-level determination, and there is no indication in the record that the examining attorney reviewed the evidence presented to this Court in the instant case, this Court declines to give any weight to the PTO examiner's likelihood of confusion determination.

   **1.      Strength of the Mark**

The strength of the mark inquiry "focuses on the distinctiveness of a mark and its recognition among the public." *Therma-Scan v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002). In general, "[t]he stronger the mark, the more likely it is that encroachment on it will produce confusion. Accordingly, the strong mark enjoys greater protection while the weak mark is afforded little support." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996) (citation and internal quotation marks omitted). Courts classify marks into one of five categories along a spectrum reflecting strength: generic, merely descriptive, suggestive,

8

arbitrary and fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753, 2757 (1992). Generic marks, which describe categories of goods and services, are the weakest type of mark and never afforded trademark protection. *Champions Golf Club, Inc.*, 78 F.3d at 1117. Descriptive marks, which describe a characteristic or ingredient of a product or service, are entitled to protection only if they have acquired distinctiveness, or secondary meaning. *Two Pesos, Inc.*, 505 U.S. at 769, 112 S Ct. at 2757. Finally, suggestive, arbitrary, and fanciful marks are "deemed inherently distinctive," and are afforded protection regardless of whether they have acquired secondary meaning. *Id.* at 768, 112 S. Ct. at 2757. In *Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, 679 F.3d 410 (2012), the Sixth Circuit explained a mark's strength has two separate aspects or components: "(1) conceptual strength, or placement of the mark on the spectrum of marks, which encapsulates the question of inherent distinctiveness; and (2) commercial strength, or the marketplace recognition of the value of the mark." *Id.* at 419 (internal quotation marks omitted). Thus, even if a mark is inherently distinctive, a court must still examine the "scope of [the mark's] commercial recognition" to properly assess its strength in a likelihood of confusion analysis. *Id.* at 420.

UPS argues that Progressive's ORDERLINK mark is conceptually weak because it describes what Progressive does—processing its clients' orders through final fulfillment. Progressive does not dispute that the mark is descriptive and, given McGovern's testimony that he chose the term because "order" and "link" are consistent with Progressive's service of processing orders through final fulfillment, (ECF No. 118 at pageID.3212), the Court finds no reason to conclude that the mark is anything other than descriptive. Even so, Progressive argues that its ORDERLINK mark is strong because it has achieved incontestable status. As the Sixth Circuit has explained, "Incontestable trademarks—those that have not been successfully challenged within five years of registration, *see*

9

15 U.S.C. § 1065—are presumed to be strong marks. When a mark is incontestable, an infringement action may not be defended on the ground that the mark is merely descriptive." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 794 (6th Cir. 2004) (internal quotation marks omitted). But the presumption of strength is simply that—a presumption that may be rebutted. In a prior decision, *Jimdi, Inc. v. Twin Bay Docks and Products, Inc.*, 501 F. Supp. 2d 993 (W.D. Mich. 2007), after surveying Sixth Circuit law on the issue, this Court discerned that, in spite of a presumption of strength arising from incontestability status, Sixth Circuit law still requires a showing of "distinctiveness." *Id.* at 1003–04. A party may rebut the presumption of strength and show that a mark is not distinctive by presenting evidence of "extensive third party *use* of similar marks. *AutoZone, Inc.*, 373 F.3d at 794. UPS has done this by presenting evidence of extensive third-party use of the term "orderlink" or its phonetic equivalent in the order processing industry as early as 1991, before Progressive began using the ORDERLINK mark. (ECF No. 97 at PageID.1778–79.) For example, Tykon, Inc. has used OrderLynx alone or in combination with other terms for customizable business-to-business order management applications. ShopWorks, a South Florida company, has used OrdersLink since 2002 in connection with e-commerce software that it offers. (*Id.*) Such third-party use, which Progressive does not dispute in its response, tends to show that ORDERLINK is a weak mark.

Apart from conceptual strength, Progressive fails to establish commercial strength—recognition of the mark in the marketplace. On this point, Progressive states that it "spent millions in advertising," but it fails to show with any specificity how much of the claimed expenditures—approximately $2.5 million over twenty years—was spent on advertising of the ORDERLINK mark, as opposed to Progressive's services offered under other marks, or in fact was actually spent on advertising itself. *See Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*, No. 1:03-

CV-414, 2005 WL 3088339, at *15 (W.D. Mich. Nov. 17, 2005) ("The evidence concerning advertising expenditures is inconclusive, as it does not isolate expenditures for this particular mark."). In short, the record is devoid of any evidence that Progressive's advertising efforts have translated into marketplace recognition. Accordingly, the evidence shows that Progressive's mark is weak, which weighs against a finding of likelihood of confusion.

### 2. Relatedness of the Services

The Sixth Circuit has identified the following three "benchmarks" for determining the relatedness of the parties' goods or services. "First, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are unrelated, confusion is highly unlikely." *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003). "The relatedness inquiry therefore focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company." *Therma-Scan*, 295 F.3d at 633 (internal quotation mark omitted). However, goods and services are not necessarily related "simply because they coexist in the same broad industry." *Id.* (internal quotation marks omitted).

Progressive argues that this factor favors a finding of likelihood confusion because the parties' services compete. UPS, on the other hand, argues that although the parties both operate in the broad category of e-commerce order fulfillment, their services are totally unrelated. The Court determines that the reality is somewhere in between—the services are related but do not compete. There is no evidence that Progressive's order fulfillment service and UPS's shipping application, which simply allows eBay and Amazon merchants to print shipping labels and manage shipments

11

of goods sold on eBay and Amazon, (ECF No. 97-20 at PageID.1870), compete in performing the same functions for customers.  As Progressive admits, its order fulfillment service assists customers in *every step* of the order fulfillment process, including assisting with placement of the order and processing of payments for such orders.  (ECF No. 135 at PageID.3348.)  There is no evidence that UPS performs such functions.[2]  Likewise, Progressive admits that it relies on UPS and its competitors—and is itself a customer of UPS—to actually ship products to customers of Progressive's clients.  (ECF No. 135 at PageID.3348; ECF No. 145-1 at PageID.3685–86.)  On the other hand, as UPS acknowledges, the parties' services are at least somewhat related because Progressive does, in fact, use and incorporate UPS's services as part of Progressive's total package of order fulfillment services provided to its clients.  Therefore, this factor is neutral in the analysis.

### 3. Similarity of the Marks

In evaluating whether the marks are similar, a court should not examine them side-by-side, but instead "must determine, in the light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented.'"  *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir. 1988) (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983)).  A court should consider the pronunciation, appearance, and verbal translation of the marks, *id.* at 1188, as well as their typeface and graphical design.  *See Therma-Scan, Inc.*, 295 F.3d at 634.

Progressive argues that this factor weighs heavily in support of a finding of likelihood of confusion because Progressive and UPS both use the term "orderlink." However, the Court must consider the commercial impression that the marks convey to consumers in the marketplace.  *See*

---

[2]Progressive cites a document titled "UPS OrderLink," dated January 2014, for the proposition that "UPS itself described . . . OrderLink [as] . . . assist[ing] with order and payment processing," but the document says nothing of the sort.  Instead, the document states that ""UPS OrderLink is a secured web-based shipping solution at ups.com that enables eBay and Amazon sellers to import their orders from these marketplaces to OrderLink and process for shipping." (ECF No. 127 at pageID.3285.)

*Homeowners Grp., Inc.*, 931 F.2d at 1109 ("It is the overall impression of the mark, not an individual feature, that counts."). Moreover, when considering similarity, a court must adhere to the "anti-dissection rule": it must view the mark in its totality and not focus on its prominent feature. *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987) (citing J. Thomas McCarthy, *Trademarks and Unfair Competition* § 23:15 (2d ed. 1984)). The evidence shows that Progressive's ORDERLINK mark appears in close proximity to, but not alongside, the business names Progressive Distribution or Progressive Commerce, in bold blue letters with a green and yellow lightning bolt in the center. (ECF No. 97-3 at PageID.1799.) In contrast, UPS always included its UPS house mark with the word "OrderLink" in the same size and type print, along with the UPS stylized shield logo and/or UPS's well-known brown and gold colors. (ECF No. 97-30.)

The ORDERLINK and UPS OrderLink marks are not very similar. While it is true that both marks use the word "orderlink," such term and close variations of it are often used in the marketplace in connection with order processing or management services. (ECF No. 97 at PageID.1778–79.) In light of extensive third-party use, no significant likelihood of confusion from that similarity would be expected. *Id.* at 572 (noting that "[t]he word 'Ceasar[]' . . . is frequently used with things Italian, including Italian food"). On the other hand, the inclusion of UPS's house mark in UPS OrderLink, as well as the UPS shield and brown and gold colors render the visual presentation and pronunciation of UPS's mark different from Progressive's ORDERLINK mark. UPS also notes that the Sixth Circuit has observed that inclusion of a house mark can "reduce[] the likelihood of confusion from any similarity that does exist." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 797 (6th Cir. 2004). Without much explanation, Progressive responds that UPS's addition of its house mark to "OrderLink" significantly increases the potential for confusion. It is true that some courts have recognized that the addition of a junior user's house mark to a senior user's mark may

13

serve to create reverse confusion. *See Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir. 1992). However, "that is not a blanket rule for all cases of reverse confusion . . . [because] the use of brand house marks is considered in the context of the specific facts to evaluate the marks' similarity." *Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12 Civ. 4112 (AJP), 2014 WL 814532, at *14 (S.D.N.Y. Mar. 3, 2014). Because Progressive fails to explain how the addition of the house mark could exacerbate reverse confusion, the Court finds no basis to conclude that such might occur.[3] *See Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF (HRL), 2010 WL 2486364, at *8 (N.D. Cal. June 15, 2010) (noting that "while it is true that a house mark could increase the likelihood of reverse confusion under some circumstances, Plaintiff does not explain how that might occur here"). Thus, the dissimilarity of the marks suggests no likelihood of confusion.

### 4. Evidence of Actual Confusion

Evidence of actual confusion is the best evidence of likelihood of confusion, but the lack of such evidence does not preclude a finding of a likelihood of confusion. *See Daddy's Junky Music Stores*, 109 F.3d at 284. Not all evidence of actual confusion is entitled to significant weight. Evidence of "chronic mistakes and serious confusion [is] worthy of greater weight," *Homeowners Grp., Inc.*, 931 F.2d at 1110, while isolated instances of confusion are entitled to little or no weight. *Id.*; *see Champions Golf Club, Inc.*, 78 F.3d at 1120 ("[F]our incidents is not a considerable quantum

---

[3]Progressive does not argue that the Court should apply a different test, or modify its application of the *Frisch's* factors in analyzing its reverse confusion claim. Some courts apply a separate test for reverse confusion, which may apply the same direct confusion factors, but in a slightly different manner. *See A & H Sportswear*, 237 F.3d at 229–234. The Sixth Circuit has not adopted such an approach for reverse confusion claims. *See Therma-Scan, Inc.*, 295 F.3d at 640 ("[D]espite TSI's arguments to the contrary, the presence of a reverse-confusion claim does not alter this analysis."). To the extent Progressive believes the Court should apply a different or modified approach to its reverse confusion claim, it has waived such argument by failing to raise it in its brief. *See Mid-Century Ins. Co. v. Fish*, 749 F. Supp. 2d 657, 675 (W.D. Mich. 2010).

of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion.").

The Court assigns no weight to this factor, as Progressive's evidence includes only one instance of confusion—not a Progressive customer, but a UPS call center employee who allegedly contacted Progressive by mistake for help with the new UPS OrderLink service. (ECF No. 118 at PageID.3219.)  This isolated instance of confusion by a non-consumer has minimal probative value regarding actual confusion.  Progressive's remaining evidence of activity on its website, which shows nothing about who visited the website or why they did so, is not evidence or actual confusion.

    **5.**    **Marketing Channels**

The marketing channels factors examines "how and to whom the respective goods or services of the parties are sold." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 519 (6th Cir. 2007) (internal quotation marks omitted). "There is less likelihood of confusion where the goods are sold through different avenues." *Id.*

The evidence shows that the parties' marketing efforts do not overlap in any significant way.  While Progressive and UPS both use the internet to market and promote their products, that fact alone does not "automatically lead to the conclusion that they use common marketing channels." *Therma-Scan, Inc.*, 295 F.3d at 637.  UPS marketed UPS OrderLink on the ups.com website on pages devoted to shipping tools for eBay and Amazon marketplace shipping, in its online version of its *Compass* magazine, and through direct sales to existing customers.  In addition, links to the UPS website's eBay and Amazon marketplace shipping pages appeared on shipping-related pages on eBay's and Amazon's websites. (ECF No. 97-30 at PageID.2036.)  While UPS conducted paid key word advertising campaigns on Google, Bing, and Yahoo, this was done after UPS changed UPS OrderLink to Marketplace Shipping. (ECF No. 136-4 at PageID.3426.)

Progressive, on the other hand, advertised through its website, in email communications and letters, by word of mouth, in magazines, and through paid advertising on search engines such as Google. (ECF No. 118 at PageID.3213, 3215.) Progressive's paid advertising targeted specific industries or geographic areas and highlighted Progressive's services and capabilities in a very general nature. (ECF No. 99-2 at PageID.2535–36.) Moreover, Progressive did not specifically target eBay merchants. (ECF No. 99-3 at PageID.2574.)

While it is possible that some incidental overlap in marketing existed, the parties targeted largely different customers through different means. This factor suggests that confusion is unlikely.

### 6. Likely Degree of Purchaser Care

"Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Homeowners Grp., Inc.*, 931 F.2d at 1111. A higher of standard of care applies "when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue . . . [or] when services are expensive or unusual." *Id.*

Progressive markets its order fulfillment services to businesses seeking to completely outsource their order fulfillment operations. It charges from a few thousand dollars to $25,000 and requires its customers to enter long-term contracts for customized services. In short, this is not an impulse purchase of an inexpensive item made at the checkout lane of a grocery store. Given these circumstances, it is reasonable to conclude that Progressive's customers exercise a high degree of care in purchasing services. *See id.* (noting the lower potential for confusion because the plaintiff's customers were "sophisticated commercial buyers who [were] purchasing business services or services for resale in the course of their business"). UPS's eBay and Amazon merchant customers also likely exercise a high degree of caution in purchasing services because they do so as part of

their commercial operations. While the UPS OrderLink application was free, and customers likely spend less on shipping services from UPS than Progressive's customers on order fulfillment services, the parties' services are so different that it is unlikely that purchasers would be confused between Progressive and UPS. This factor thus weighs substantially in favor of a finding of no confusion.

### 7. UPS's Intent

This factor is relevant if a party chooses a mark with the intent of causing confusion. If such is the case, that fact by itself may be sufficient to support an inference of confusing similarity. *Wynn Oil*, 839 F.2d at 1189. Direct evidence of intentional copying is not necessary to prove intent. *Daddy's Junky Music Stores*, 109 F.3d at 286. "Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Id.* However, a defendant's knowledge of a protected mark, alone, will not support a finding of intent to confuse if other circumstances show that the defendant believed there was no infringement. *See AutoZone, Inc.*, 373 F.3d at 800. Moreover, a finding of "bad-faith intent to infringe upon another mark may not increase the likelihood of confusion if the other seven factors suggest that confusion is improbable." *Id.* at 799.

Progressive argues that the evidence shows UPS's intent to cause confusion because UPS adopted its mark with knowledge of Progressive's mark. Progressive notes that, after receiving the PTO search results, Christine Allen informed upper management that "OrderLink" was not available because it was registered to Progressive. Progressive argues that it has shown bad intent because, in spite of that knowledge, and even after the PTO rejected UPS's application to register UPS OrderLink, UPS proceeded to use the UPS OrderLink mark. It is undisputed, however, that UPS initially considered using OrderLink to promote its marketplace shipping application *before* it had

17

any knowledge of Progressive or its mark. ( ECF No. 97-25 at PageID.1959.) In addition, in the same email in which Allen said that she thought that OrderLink was unavailable because it was registered to Progressive, she noted the existence of "shopping cart software called 'Order-Link'" by Ashop Software, and offered to "ask Legal to do a more formal trademark search" if UPS still wanted to use the mark. (ECF No. 97-26 at PageID.1988.) After conducting other searches, UPS learned that several third parties were using the term OrderLink. (ECF No. 97-25 at PageID.1976.) Finally, UPS reviewed Progressive's website and determined that Progressive's services were completely different from the service that UPS planned to offer through its new web application. (ECF No. 97-21 at PageID.1866.) This evidence, which is unrebutted, shows that UPS had no intent to benefit from Progressive's mark.

Progressive also argues that UPS's decision to include its UPS house mark with OrderLink somehow shows that UPS intended to trade on Progressive's goodwill. As the above-cited evidence demonstrates, UPS had no reason to believe that its adoption of the UPS OrderLink mark would negatively affect Progressive's mark in any manner, whether by direct or reverse confusion.

Finally, Progressive's argument that UPS demonstrated bad intent by dragging its feet in discontinuing its use of UPS OrderLink in the face of Progressive's February 14, 2014 cease and desist letter is without merit. As discussed above, there is no indication that UPS adopted the UPS OrderLink mark with any intent to confuse in the first instance. After receiving the cease and desist letter, UPS initially attempted to negotiate a coexistence agreement with Progressive, but when such efforts failed, it began to change the name even before Progressive filed the instant lawsuit, two months after it sent the cease and desist letter.

In light of the absence of any evidence of UPS's bad intent, this factor weighs against a likelihood of confusion.

**8.     Expansion of Product Line**s

This factor is not relevant to the analysis in this case, as both parties acknowledge that there is no evidence that either party will expand into the other's sphere of business.

Considering the applicable *Frisch's* factors, to the extent any of them tilts at all toward a likelihood of confusion, no factor or combination of factors suggests that confusion is anything more than a remote possibility. On the other hand, the overwhelming weight of the pertinent factors showing that ORDERLINK is a weak mark, the marks are not very similar, the parties' services are completely different and do not compete, the parties market their services in different ways without any significant overlap, and purchasers of the parties' respective services are likely to use a high degree of care, compels a conclusion that there is no likelihood of confusion.

**B.     MCPA Claim**

The MCPA applies to "goods, property, or service [used] primarily for personal, family, or household purposes." M.C.L. § 445.902(g). The MCPA "does not apply to purchases that are primarily for business purposes." *Slobin v. Henry Ford Health Care*, 469 Mich. 211, 216, 666 N.W.2d 632, 634 (2003). UPS contends that it is entitled to summary judgment on this claim because the services UPS offered under UPS OrderLink were used by merchants with commercial stores on Amazon and eBay for business purposes, and not for personal, family, or household purposes. Progressive responds that it has a viable claim because UPS OrderLink was used by both individual sellers and small businesses. Progressive's argument lacks merit, because the proper focus of the MCPA is the use to which goods or services are put. *Zine v. Chrysler Corp.*, 236 Mich. App. 261, 273–75, 600 N.W.2d 384, 393–94 (1999). Whether some of those merchants were individuals is irrelevant, because it is undisputed that they used the UPS OrderLink service for business or commercial purposes, not personal purposes.

19

## IV. CONCLUSION

For the foregoing reasons, the Court will grant UPS's motion for summary judgment.

An Order consistent with this Opinion will be entered.


Dated: May 16, 2016                                /s/ Gordon J. Quist
                                                  GORDON J. QUIST
                                              UNITED STATES DISTRICT JUDGE